Steve W. Berman (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: 206-623-7292
Facsimile: 206-623-0594
Email: steve@hbsslaw.com

Robert B. Carey (*Pro Hac Vice pending*)
Leonard W. Aragon (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: 602-840-5900
Facsimile: 602-840-3012
Email: rob@hbsslaw.com
        leonard@hbsslaw.com

[Additional Counsel Listed on Signature Page]

Attorneys for Shawne Alston

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAWNE ALSTON, on behalf of himself and a class of persons similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> ELECTRONIC ARTS INC., <br><br> Defendant. | Case No. ____ <br><br> **COMPLAINT** |

## I.    INTRODUCTION

1.    This suit arises out of the blatant and unlawful use of National Collegiate Athletic Association ("NCAA") student-athlete names and likenesses in videogames produced by videogame manufacturer Electronic Arts ("EA"). Despite clear prohibitions on the use of student names and likenesses in NCAA bylaws, contracts, and licensing agreements, EA utilizes the likenesses of individual student-athletes in its NCAA basketball and football videogames to

1

increase sales and profits. And while names are not explicitly used in publically released versions of the game, NCAA basketball and football videogames submitted to its partners for approval before release—including NCAA member institutions—contain the names of student athletes on the jerseys. The names are removed in the final product, but the rest of the attributes identifying the players remain. EA then intentionally circumvents its agreement not to use student-athletes' names in commercial ventures by allowing gamers to upload entire rosters, which include players' names and updated statistical information, directly into the game in a matter of seconds. The use of player names and likenesses benefits EA by increasing the popularity of the relevant games, which in turn increases the profits EA earns.

2.      This is a proposed class action on behalf of NCAA student-athletes whose names and likenesses have been used without their permission or consent to increase revenues and profits for EA in violation of state law.

## II.      JURISDICTION AND VENUE

3.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other putative Class members are citizens of different states than Defendant EA.

4.      This Court has personal jurisdiction over Plaintiff because he submits to the Court's jurisdiction. This Court has personal jurisdiction over Electronic Arts because EA conducts substantial business in the District and has submitted to the Court's jurisdiction for claims involving New Jersey common law right of publicity. Further, EA has sold and caused to be sold in this District NCAA-branded videogames containing Plaintiff's and putative class members' names and likenesses.

5.      Venue is proper in this District under 28 U.S.C. § 1391 because corporations, such as EA, are "deemed to reside in any judicial district in which they are subject to personal jurisdiction," and because EA sold and caused to be sold in this District NCAA-branded videogames containing Plaintiff's and putative class members' names and likenesses. Further,

EA has consented to this venue as proper for claims involving the New Jersey common law right of publicity.

### III.    PARTIES

6.    Plaintiff Shawne Alston, an individual, is a West Virginia resident and the former starting running back for the West Virginia University football team.

7.    Defendant EA, a Delaware corporation, is a multi-billion dollar interactive entertainment software company that produces the NCAA Football, NCAA Basketball, and NCAA March Madness videogame franchises.[1] It describes itself as the "world's leading interactive entertainment software company." Its revenue history supports this claim. For fiscal year 2013, EA is projecting net revenues to exceed $4 billion dollars. EA's principal place of business is Redwood City, California, but EA sells its games directly to consumers throughout the country through its website www.ea.com and indirectly through major retailers in all fifty states. Since at least 2007, EA has sold in the District, directly and through vendors, thousands of NCAA-branded videogames containing the names and likenesses of Plaintiff and class members.

### IV.    FACTUAL BACKGROUND

8.    EA produces the NCAA Football, NCAA Basketball, and NCAA March Madness videogame franchises. Videogame titles within these franchises simulate basketball and football games between NCAA member schools. Consumers demand that these games simulate actual college games in the most realistic manner possible. In the words of its licensing agent the Collegiate Licensing Company ("CLC"):  "A failure to keep up with technology and take full advantage from a consumer standpoint may make the NCAA [videogame] titles less valuable." As a result, each year EA spends millions to ensure the realism of the games, and advertises this realism in the promotion of its products. Specifically, pursuant to a license with CLC, the NCAA's licensing company, EA replicates team logos, uniforms, mascots, and member school stadiums with almost photographic realism. In addition to computer generated images, EA includes actual photographs of uniformed student-athletes in the games.

---

[1] EA quit producing NCAA basketball and NCAA March Madness videogames in 2010.

9.   As discussed in more detail below, EA is not permitted to utilize player names and likenesses. In reality, however, EA with the knowledge, participation, and approval of the NCAA and CLC extensively utilizes actual player names and likenesses in NCAA-branded videogames to allow consumers to easily identify the college athletes in the game. EA's motivation is simple: more money. As the NCAA, CLC, and EA know, heightened realism in NCAA videogames translates directly into increased sales, and therefore, increased revenues for EA and increased royalties for its partners.

A.    **Prohibitions on Use of Names or Likenesses**

10.   The NCAA does not officially permit the licensing of NCAA student-athlete likenesses or the use of their names. In fact, NCAA Bylaw 12.5 specifically prohibits the commercial licensing of an NCAA student-athlete's "name, picture or likeness."

11.   To help enforce this rule, all incoming freshman and transfer students, including Plaintiff and class members, are required to enter into a contract with the NCAA that prohibits the student-athlete from using his name, picture, or likeness for commercial purposes.

12.   Likewise, the contract prohibits the NCAA from using Plaintiff's and class members' names, pictures, and likenesses for commercial purposes.

13.   The NCAA, however, sanctions, facilitates, and profits from EA's use of student-athletes' names, pictures, and likenesses despite contractual obligations prohibiting such conduct.

B.    **The Contract Between the NCAA and the Student-Athletes**

14.   The contract each incoming freshman and transfer student-athlete signs is titled Form 08-3a Student-Athlete Statement – Division I. *See* Exhibit A.

15.   The contracts used during the class period are, upon information and belief, substantively analogous to Exhibit A, if not identical, and are also titled Form XX-3a, with XX representing the year the contract is presented to the student.

16.   Plaintiff and putative class members entered into such contracts and signed Form 08-3a or its equivalent in exchange for certification from the NCAA that allows them to participate

in sanctioned NCAA Division I sporting events. The contract has seven parts, all of which must be executed by the student to receive certification that he is eligible to participate in NCAA Division I sporting events.

17. Part I requires the student-athlete to affirm his eligibility to participate in NCAA events. Among other things, the student-athlete affirms that he has received a copy of the NCAA rules and that he had an opportunity to ask questions about them. He also affirms that he "meet[s] the NCAA regulations for student-athletes regarding eligibility, recruitment, financial aid, amateur status and involvement in gambling activities."

18. Part II requires the student-athlete to waive certain privacy rights under the Family Educational Rights and Privacy Act of 1974. Among other things, the student-athlete agrees to permit the disclosure of education records, drug test results, social security numbers, race and gender identification, diagnosis of certain education related disabilities, financial aid records, and "any other papers or information pertaining to your NCAA eligibility."

19. Part III requires the student-athlete to affirm that he has read and understands the NCAA amateurism rules.

20. Part IV requires the student to authorize and grant a limited license to the "NCAA [or a third party acting on behalf of the NCAA (*e.g.*, host institution, conference, local organizing committee)] to use the student-athlete's "name or picture to generally promote NCAA championships or other NCAA events, activities or programs."

21. Part V requires the student-athlete to disclose whether he has ever tested positive for a banned substance by the NCAA and/or by a non-NCAA national or international athletics organization.

22. Part VI is for transfer students only. The contractual provision requires the student-athlete to identify himself, if appropriate, as a transfer student and to describe, if applicable, any previous involvement in NCAA rules violation(s).

23. Part VII is for incoming freshmen only. The contractual provision requires the student-athlete to confirm that he has a validated ACT and/or SAT score.

24.   The contract is valid from the date the document is signed and remains in effect until a subsequent Division I Student-Athlete Statement/Drug Testing Consent form is executed.

25.   The contract is required by the NCAA Constitution and Bylaws, and student-athletes are ineligible to participate in any intercollegiate competition unless they execute the contract. In return and in consideration for the above disclosures, waivers, affirmations, and limited license, the NCAA agrees to grant players eligibility to participate in Division I athletics. The contract is an adhesion contract due to the unequal bargaining power of the parties and the take it or leave it nature of the contract.

26.   EA is not a third party acting on behalf of the NCAA, as contemplated by section IV of the contract. Nor is EA using Plaintiff's or class members' names, pictures, or likenesses to generally promote an NCAA championship or other NCAA event, activity, or program as contemplated by section IV of the contract. Instead, EA is using Plaintiff's and class members' names, pictures, and likenesses for a commercial purpose and without consent even though the licensing agreements between the NCAA and CLC and between EA and CLC explicitly prohibit the use of NCAA student-athlete names and/or likenesses in NCAA-branded videogames.

**C.     EA's Blatant Use of Player Names and Likenesses**

27.   EA purports to honor the NCAA's rule nominally prohibiting the use of player likenesses. In fact, it does not. As an EA spokesperson candidly acknowledged in a 2006 interview with *The Indianapolis Star*, its real mindset with regard to the use of player names and likenesses can be summed up in one sentence:  "Ok, how far can we go?"

28.   The answer can be found in the games themselves. EA seeks to precisely replicate each school's entire team. With rare exception, virtually every real-life Division I football or basketball player in the NCAA has a corresponding player in EA's games with the same jersey number, and virtually identical height, weight, build, and home state. In addition, EA matches the player's skin tone, tattoos, hair color, and often even a player's hair style, although this last characteristic can be highly variable over even a single season.

29.  EA's misappropriation of player likenesses is not limited to superstars at large schools or top programs. In the 2008-2009 NCAA football season, Kent State Golden Flashes running back Eugene Jarvis, for example, stood a mere 5'5" and weighed only 170 pounds. He was also an African-American red-shirt junior from Pennsylvania who wore number 6 for the Golden Flashes. And although he is extremely talented, Mr. Jarvis is unusually small for a college football player. For these reasons, one would expect a randomly generated virtual running back for the Golden Flashes to be somewhat dissimilar to Mr. Jarvis. But here are the first two profile pages for Golden Flashes player number 6 from the NCAA 2009 Football game:



30.  Number 6 for the Golden Flashes is clearly Mr. Jarvis. Both players are 5'5", 170-pound, African-American players. Both are also red-shirt juniors from Pennsylvania, and both are the starting running back for the Golden Flashes. This is not a mere coincidence.

31.  EA's blatant misappropriation of player likenesses is highlighted by a comparison of EA's NCAA titles to its titles based on professional leagues for which EA has the legal right to

player likenesses through license agreements with the relevant players' unions. If EA were not utilizing actual player likenesses, one would expect significant changes to the virtual player once the corresponding real player entered a professional league. In fact, the likeness of NCAA players who later enter a professional league remains virtually identical across titles.

32.   For example, the profile below on the right, taken from the 2008 NCAA football game, shows number 77, an offensive lineman for the Michigan Wolverines. During that period of time, Jake Long wore jersey number 77 for the Wolverines. On the left is a screenshot of Jake Long from the Madden NFL 2009 football game. The two pictures are virtually identical.

 

33.   The similarities in the two images are not mere coincidence. Indeed, it would be nearly statistically impossible for randomly generated players to match so closely their real-world counterparts. Mr. Long and Mr. Jarvis are not unique examples. They were randomly chosen to show how similar almost all players are to their virtual counterparts.

34.   Misappropriation of basketball players is equally egregious. For example, Georgetown All-American center Roy Hibbert is 7'2"–unusually tall even for a college basketball player–and weighs 275 pounds. In the 2007 season, Mr. Hibbert was also an African-American senior from Maryland who often played with an arm or elbow sleeve. He also wore jersey number 55 for the Georgetown Hoyas. One would expect a randomly generated "No. 55" for Georgetown to have, at most, a couple of these characteristics. But here is the profile for Georgetown number 55.





35.  Number 55 in EA's NCAA 08 March Madness game is clearly supposed to be Mr. Hibbert. The two match in every respect. Both have nearly the exact same height and weight. Both are African-American players from Maryland. Both are seniors in the 2007 season, and both are the starting center for the Georgetown Hoyas. In fact, both even wear an arm sleeve.

36.  And like football players, the misappropriation of likenesses is not limited to superstars or top programs. For example, Travis Pinick is a guard/forward who wore jersey number 5 for the Yale Bulldogs during the 2007-2008 season, a school known more for academics than basketball. Mr. Pinick is 6'7", weighs 210 pounds, and went to high school in California. Unsurprisingly, virtual "No. 5" for the Bulldogs in the 2008 game is also a guard/forward from California with the same height and weight.

37.   In addition to the physical features, EA even matches players' idiosyncratic equipment preferences such as wristbands, headbands, facemasks, and visors.

38.   For example, in the 2009 NCAA Football game, Texas Tech wide receiver "No. 5" plays with a back plate under his uniform just like the real number 5, Texas Tech All-American wide receiver Michael Crabtree. Additionally, both are 6'3" red-shirt sophomore wide receivers from Texas.

39.   In the same game, Kansas State quarterback "No. 1" plays with an arm sleeve just like the real number 1, Kansas State All-American quarterback Josh Freeman. Mr. Freeman is also a 6'6", 250-pound, junior quarterback from Missouri, just like his virtual twin.

40.   Likewise, Ohio State linebacker "No. 33" plays with thin arm-bands on his upper arm, just below his bicep, wrist wraps and gloves. Interestingly, so does the real number 33, Ohio State All-American, Nagurski Trophy[2] winner, and Butkus Award[3] winner, linebacker James Laurinaitis. Both are also 6'3", 244-pound seniors from Minnesota.

41.   Once again, these are not unique examples. Defendant deliberately and systematically misappropriates players' likenesses to increase revenues and royalties at the expense of student-athletes since, upon information and belief, 1999.

42.   In fact, to ensure it matches these unique player equipment preferences as accurately as possible, EA sends detailed questionnaires to NCAA team equipment managers to glean precisely the idiosyncratic individual player details.

43.   When players have unique, highly identifiable playing behaviors, EA attempts to match those as well.

44.   EA also matches the virtual player's home state to the player's actual home state, and often lists a city close to the player's real hometown as the virtual player's home town.

_____

[2] The award given to the top defensive player in the country.
[3] The award given to the top college linebacker.

45.   The only detail that EA omits is the real-life player's name on the jersey of his electronic equivalent. As one commentator observed, "the omission of players' names seems little more than a formality, done with a wink and a nudge."

46.   In fact, when the game is sent to its partners—such as the CLC, NCAA, and member schools—for review and approval before release to the public, the names of current student-athletes are on the jerseys. After the partners review and approve the games, EA removes the names from the jerseys in the final versions sold to consumers. EA does this to ensure that the correct statistics are calculated for each player. This is done secretly because, according to the CLC, EA's partner in creating NCAA-branded videogames, "this is exactly the type of [information] that could submarine the game if it got into the media."

47.   Despite the initial lack of players' names on jerseys, gamers rarely if ever distinguish between the "real" player and the player in EA's videogames. For example, through its former website www.easportsworld.com, EA allowed gamers to post short video clips from the videogame. Clips that feature unique plays are often labeled with actual player names even though they feature only EA's computer generated simulations.

48.   The omission of players' names has little consequence because EA has intentionally designed its game so that players of the game can easily upload entire rosters of actual player names. Companies such as Gamerosters.com LLC each year release data files that contain the complete rosters for each NCAA Division I school. These rosters can be placed on a flash drive or memory card, and then easily uploaded to the game. Once uploaded, the default jerseys in the game that contain only players' numbers are replaced with jerseys that contain both players' actual names and numbers, and in-game announcers (who pre-record the names of student-athletes) then refer to players by their real names. These third parties often correct minor and insignificant mistakes in height or weight thus making EA's representations all the more accurate.

49.   In the recent versions of its games for the Sony PlayStation 3 and Xbox, EA intentionally made the process of obtaining actual player names even easier by allowing players

to share rosters online using its "EA Locker" feature. The EA Locker feature allows gamers to upload rosters from other gamers while in the game itself. Before the EA Locker, gamers had to download rosters from a computer, upload the files to the gaming console and then transfer the rosters to the game. Now the gamer can obtain full NCAA rosters in a matter of seconds without using a computer. Furthermore, numerous websites, such as www.freencaa09rosters.com, keep a list of players who offer free NCAA rosters utilizing the EA Locker feature.

50.   EA could easily block users from uploading actual player names and, in fact, does block users from uploading certain names. For example, users cannot upload names that contain profanities.

51.   EA additionally encourages and facilitates the use of players' names and likenesses by allowing gamers to post screen shots–electronic pictures taken from their game–containing players' real names on its website. For example, the following is a screenshot taken directly from www.easportsworld.com that clearly shows the names of three players from the UCLA Bruins. In addition to the names, the virtual players match their real life counterparts in all other material respects:



52.  The 2010 version of NCAA Basketball proudly points out the realism in the game and the likeness is startling. What you see in the game aims to replicate what you see on a broadcast. Here are a few examples of overlays you will see at different points in the game.

**Pre-game**



**Starting Lineups**



53.  In the 2010 game, No. 13 of Stanford is recognizable as Stanford guard Emmanuel Igbinosa and No. 10 is Guard Drew Shiller.

54.  No. 12 in the same game, identified as a junior forward, is recognizable as Duke's Kyle Singler, and the remaining starting lineup directly corresponds to actual Duke players with the same jersey numbers.

55.  These are not isolated examples. These examples do, however, illustrate the blatant and continued use of student-athlete likenesses in NCAA related games, especially when one considers that these images are taken from a game that was released after the filing of several class action lawsuits regarding the use of student-athletes' rights of publicity.

## V.   INJURY TO RIGHT OF PUBLICITY CLASS MEMBERS AND PLAINTIFF

56.  Student athletes' names and likenesses are extremely valuable, intangible property. For example, it has been publicly reported that EA paid the NFL Players Union, through its licensing arm, nearly thirty-five million dollars each year for the use of players' names and likenesses in its Madden NFL videogame franchise.

57.  Despite contractual provisions prohibiting the use of player names and likenesses, and in clear violation of the NCAA's own rules, EA uses student-athletes' names and likenesses in EA's videogames for its own monetary gain and without any compensation to the individual athletes. Nor does EA obtain consent before using student athletes' names and likenesses in NCAA branded videogames.

58.  Like virtually every other player, Plaintiff had his name and likeness replicated in several NCAA branded videogames without his consent.

## VI.   SHAWNE ALSTON

59.  Plaintiff Shawne Alston was a heavily recruited three star athlete from Hampton Virginia. In high school, Alston ran for over 2400 yards and 38 touchdowns and was named a first team all-state running back his senior year. After leading Phoebus High School to a Virginia state championship, the high school football star committed to play at West Virginia University.

14

60.   Alston enrolled at WVU in the summer of 2009 and graduated three years later. After graduating, he continued taking classes at WVU until enrolling in graduate school in 2013.

61.   Alston played his first football game at WVU in the fall 2009 as a true freshman.  In the official roster, he was listed as No. 35, a 6'0", 218-pound freshman running back from Hampton, Virginia. Alston only had one recorded running statistic during his freshman year, and played mostly on special teams and in pass blocking schemes.

62.   For his sophomore year (2010-2011), Alston switched to No. 34.  In the official roster, he was listed as a 5'11", 222-pound sophomore running back from Hampton, Virginia.

63.   In the 2011 NCAA Football game, virtual No. 34[4] has the same height, weight, position, home state, skin tone, hair color, facial features, and handedness as Alston. Both are also the backup running back for the WVU Mountaineers.

64.   During his junior year (2011-2012), Alston switched to jersey No. 20. In the WVU official roster, he was listed as a 5'11", 221-pound junior running back from Hampton, Virginia. That year, Alston led his team in touchdowns and yards per carry. The WVU Mountaineers were ranked in the top 25 for most of the season and played Clemson in the BCS Orange Bowl. The WVU Mountaineers were underdogs against the 14th ranked Clemson Tigers. Alston and his fellow Mountaineers, however, would go on to crush the Tigers 70-33 and set several bowl records for scoring.

65.   In the 2012 NCAA Football game, virtual No. 20 has the same height, weight, position, home state, skin tone, hair color, facial features, and handedness as Alston. Both are also the backup running back for the WVU Mountaineers.

66.   During his senior year (2012-2013), Alston continued to wear No. 20 and was listed as a 5'11", 236-pound senior running back from Hampton, Virginia in the team's official roster. That year, Alston scored seven touchdowns and again led his team in yards per carry. The team

---

[4] Alston wore No. 20 in practice.

was ranked as high as eighth in the nation during the year, and went on to play in the Pinstripe Bowl against Syracuse University.

67.   In the 2013 NCAA Football videogame, virtual No. 20 has virtually the same height, weight, position, home state, skin tone, hair color, facial features, and handedness as Alston. Both are also the backup running back for the WVU Mountaineers.

68.   Alston's virtual doppelganger—WVU No. 20—also appears on the back cover of the 2013 NCAA Football game for the Xbox—thousands of copies of which were sold or caused to be sold by EA in New Jersey.



69.   Above Alston's virtual twin, is Robert Griffin III. Mr. Griffin was paid—after exhausting his collegiate eligibility and becoming a professional player—to appear on the back

cover of the game. Plaintiff and the other students on the back cover were not paid for use of their likenesses, nor did they consent to the use.

70.   In 2013, after completing his college career and graduating from WVU, Alston signed a free agent contract with the New Orleans Saints. Alston was released in June 2013 and retired from organized football shortly thereafter.

71.   Alston is now in graduate school pursuing a Masters of Business Administration.

## VII.   RIGHT OF PUBLICITY CLASS ACTION ALLEGATIONS

72.   Plaintiff sues on his own and on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23 for games sold between 2005 and the present. The putative Right of Publicity Class[5] is defined as:

> Virtual Player Class:
>
> All NCAA football and basketball players listed on the official opening-day roster of a school whose team was included in any interactive software produced by Electronic Arts, and whose assigned jersey number appears on a virtual player in the software.
>
> Photograph Class:
>
> All persons whose photographed image was included in any NCAA-related interactive software produced by Electronic Arts.

73.   Excluded from both classes are Defendant, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies, class counsel and their employees, and the judicial officers, and associated court staff assigned to this case. Also excluded from the Virtual Player Class are the limited number of players whose assigned jersey numbers appear in the game, but whose heights and/or weights are not within one inch of their respective roster heights and/or within 10% of their respective roster weights. Also excluded from the Photograph Class are those people who gave written consent to be included in the NCAA-related interactive software produced by EA.

---

[5] Though it consists of two components, the Right of Publicity class is, for convenience, referred to throughout in the singular.

74.   The persons in the Right of Publicity Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Right of Publicity Class is easily ascertainable, as each class member can by identified by using Defendant's records. Plaintiff is informed and believes that there are many thousands of Right of Publicity Class members.

75.   There are common questions of law and fact specific to the Right of Publicity Class that predominate over any questions affecting individual members, including:

(a)   Whether EA utilizes NCAA player likenesses in its videogames;

(b)   Whether such use is unlawful;

(c)   Whether EA uses NCAA player names in its videogames;

(d)   Whether such use is unlawful;

(e)   Whether EA uses names and/or likenesses of NCAA players for a commercial purpose;

(f)   Whether EA acted willfully;

(g)   Whether EA violated the common law right of publicity; and

(h)   Whether class members have been damaged by Defendant's conduct and the amount of such damages.

76.   Plaintiff's claims are typical of the Right of Publicity Class' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Right of Publicity Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

77.   Plaintiff will fairly and adequately protect the interests of the class. He will vigorously pursue the claims and have no antagonistic conflicts. Plaintiff has retained counsel who are able and experienced class action litigators and are familiar with the videogame industry and EA specifically.

78.   In the last year alone, counsel has obtained a $27 million settlement for class members in an antitrust lawsuit against EA[6] and obtained a multimillion dollar jury verdict—

---

[6] *Pecover v. Electronic Arts* (No. 08-cv-02820).

following a four week trial—against EA on behalf of the original developer of the Madden Football videogame franchise.[7] In addition, counsel obtained a highly favorable Ninth Circuit decision against EA on July 31, 2013. The case involved the interaction between the First Amendment and violations of California right of publicity law.[8] Lastly, counsel has engaged in discovery against EA for almost four years in the case captioned *In re: NCAA Student-Athlete Name and Likeness Licensing Litigation*, in their capacity as co-lead counsel for the antitrust plaintiffs in that matter.[9] Several issues raised in that case are substantively similar to the issues raised in this case.

79.    Defendant has acted or refused to act on grounds that apply generally to the Right of Publicity Class, and final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. A class action is also appropriate because Defendant has acted and refused to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole. Questions of law or fact common to class members predominate over any questions affecting only individual members. Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendant. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendant and substantially impede or impair the ability of class members to pursue their claims. It is not anticipated that there would be difficulties in managing this case as a class action.

---

[7] *Antonick v. Electronic Arts* (No. 3:11-cv-01543)
[8] *Samuel Keller, et al. v. Electronic Arts Inc* (No. 10-15387)
[9] The consolidated case is pending in the Northern District of California (4:09-cv-01967).

## VIII.   RIGHT OF PUBLICITY CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### (Common Law Right of Publicity)

80.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

81.   Plaintiff and class members' names, voices, signatures, photographs, images, likenesses, distinctive appearances, biographical data, gestures, and mannerisms have commercial value.

82.   For commercial purposes, EA has used and continues to use Plaintiff's and class members' names, images, likenesses, biographical data, and distinctive appearances without their consent in connection with and for the purposes of advertising, selling, and soliciting purchases of its videogames, including its NCAA Football, NCAA Basketball and NCAA March Madness franchises.

83.   Specifically, EA has used Plaintiff's name, image, likeness, biographical data, and distinctive appearance by incorporating such items into a virtual player in NCAA Football videogames sold in New Jersey from 2010 to 2013. Plaintiff's name, image, likeness, biographical data, and distinctive appearance increases the realism of the games. This allows EA to increase sales and profits.

84.   The use of Plaintiff's and class members' names, images, likenesses, biographical data, and distinctive appearance is not merely incidental to the total presentation, but rather the sum and substance of the game. EA wants the game to be as realistic as possible, with as little variation from actual NCAA rosters as humanly possible. The inclusion of Plaintiff's and class members' names, images, likenesses, biographical data, and distinctive appearance is a necessary component of the game.

85.   EA never received Plaintiff's or class members' consent, written or otherwise, to use their likenesses, images, names, or other distinctive appearances, and neither Plaintiff nor the Class consented to such use.

86.  EA has willfully and intentionally used and continued to use Plaintiff's and class members' rights of publicity. Indeed, EA admits it uses "all the attributes and jersey numbers of the players." EA also facilitates the use of Plaintiff and class members' names by updating rosters on a weekly basis so that players injured or "dominating in real life" would have their attributes "pumped up" to reflect real life success.

87.  EA has solicited, advertised, sold, and caused to be sold NCAA football and basketball games in New Jersey directly to New Jersey consumers, and upon information and belief, developed information in New Jersey to be used in its game's development. Upon information and belief, EA has sold thousands of games to New Jersey consumers during the class period via its website, and has sold tens of thousands of games through retailers.

88.  As a result of EA's conduct, Plaintiff and class members have been injured.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

89.  Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

90.  To the detriment of Plaintiff and class members, EA has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein. EA has been unjustly benefited through the sale of videogames that utilize the names, images, and likenesses of Plaintiff and class members.

91.  The NCAA and CLC represent and purport to protect Plaintiff and putative class members when entering into contracts with commercial entities such as EA.  EA contractually agrees to abide by NCAA rules, to include the rules and regulations prohibiting the use of student-athlete names and likenesses for commercial purposes.

92.  If Plaintiff and class members knew that EA was intentionally using student-athlete names and likenesses in contravention of NCAA rules, regulations, and contractual obligations, they would have expected remuneration given that the NCAA and CLC condone such acts despite rules protecting student-athletes from commercial exploitation.

93.     Between EA and Plaintiff/class members, it would be unjust for EA to retain the benefits attained by its wrongful actions. Accordingly, Plaintiff and class members seek full restitution of EA's enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.     Certification of the action as a Class Action pursuant to the Federal Rules of Civil Procedure, and appointment of Plaintiff as the Class Representative and his counsel of record as Class Counsel;

B.     Compensatory and punitive damages;

C.     Disgorgement of all profits earned by Defendant from the sale of videogames containing the names, images, and likenesses of Plaintiff and class members;

D.     Prejudgment and post-judgment interest on such monetary relief;

E.     Equitable relief in enjoining future use of the names, images, or likenesses of Plaintiff and class members in Defendant's videogames;

F.     Seizure and destruction of all copies of any videogames in the possession, custody or control of Defendant or third parties (to the extent permitted by law) that infringe upon Plaintiff's and class members' rights of publicity;

G.     The costs of bringing this suit, including reasonable attorneys' fees; and

H.     All other relief to which Plaintiff and class members may be entitled at law or in equity.

**JURY DEMAND**

Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b) and New

Jersey Rule of Court 4:35-1, as to all issues in the above matter.

PINILISHALPERN, LLP

By

William J. Pinilis (WJP2130)
PINILIS HALPERN LLP
160 Morris Street
Morristown, New Jersey 07960
Telephone: 973-401-1111
Facsimile: 973-401-1114
Email: wpinilis@consumerfraudlawyer.com

Steve W. Berman (*Pro Hac Vice pending*)
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: 206-623-7292
Facsimile: 206-623-0594
Email: steve@hbsslaw.com

Robert B. Carey (*Pro Hac Vice pending*)
Leonard W. Aragon (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: 602-840-5900
Facsimile: 602-840-3012
Email: rob@hbsslaw.com
        leonard@hbsslaw.com

Stuart M. Paynter (*Pro Hac Vice pending*)
Celeste H.G. Boyd (*Pro Hac Vice pending*)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C.  20005
Telephone: 202-626-4486
Facsimile: 866-734-0622
Email: stuart@smplegal.com
        cboyd@smplegal.com

Attorneys for Plaintiff Shawne Alston

Dated: August 27, 2013

JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Shawne Alston, individually and on behalf of all persons similarly situated,

## DEFENDANTS

Electronic Arts Inc.

**(b)** County of Residence of First Listed Plaintiff   Hampton, VA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Delaware
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
William J. Pinilis, Esq. c/o PinilisHalpern, LLP
160 Morris Street, Morristown, NJ  07960
Tel: 973-401-1111

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 710 Fair Labor Standards Act | ☐ 810 Selective Service |
| ☒ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☒ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28USC 1332(a)

Brief description of cause:
Unauthorized use of plaintiff's name, image, likeness, biographical data and appearance w/o consent

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)

JUDGE   Hart v. Electronic Arts

DOCKET NUMBER   3:09-cv-05990-FLW-LHG

DATE
08/27/2013

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #         AMOUNT         APPLYING IFP         JUDGE         MAG. JUDGE